[Cite as *State v. Schaeffer*, 2015-Ohio-3531.]

### IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### SENECA COUNTY

**STATE OF OHIO,**

      **PLAINTIFF-APPELLEE,**           **CASE NO. 13-14-34**

      **v.**

**CHARLES V. SCHAEFFER,**           **O P I N I O N**

      **DEFENDANT-APPELLANT.**

**Appeal from Seneca County Common Pleas Court**
**Trial Court No. 14CR0124**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision: August 31, 2015**

**APPEARANCES:**

    *Scott B. Johnson* **for Appellant**

    *Derek W. DeVine* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant Charles V. Schaeffer ("Schaeffer") appeals the October 31, 2014, judgment of the Seneca County Common Pleas Court sentencing him to life in prison with parole eligibility after 25 years once Schaeffer was convicted in a jury trial of Complicity to Aggravated Arson in violation of R.C. 2923.03(A)(2)/(F) and R.C. 2909.02(A)(1)/(B)(2), a felony of the first degree, Complicity to Aggravated Murder in violation of R.C. 2923.03(A)(2)/(F) and R.C. 2903.01(B)/(F), a special felony, Complicity to Murder in violation of R.C. 2923.03(A)(2)/(F), and R.C. 2903.02(B)/(D), a special felony, and Complicity to Attempted Murder in violation of R.C. 2923.03(A)(2)/(F), R.C. 2923.02(A)/(E)(1) and R.C. 2903.02(B)(D), a felony of the first degree.

{¶2} The facts relevant to this appeal are as follows. On May 26, 2014, in the early morning hours, Shey Weiker started a fire at the residence of Daniel Marker by throwing a flare. Weiker believed Marker had molested her son. Two women were staying at Marker's residence at the time. Marker's home was engulfed in flames and Marker died of carbon monoxide poisoning, along with one of the women who was staying at his residence. The second woman, Dana Weatherall, survived by jumping out of the home's back window. She sustained injuries that left her in the hospital for four days.

{¶3} Weiker eventually admitted to her involvement in the fire, and pled guilty to various crimes including Aggravated Arson, Murder, and Aggravated Murder. Weiker implicated Schaeffer as being complicit in the crimes. She indicated that just prior to starting the fire she had been talking with Schaeffer about various ways to burn down child molesters' homes, that Schaeffer told her using a flare or "fusee" would leave no evidence behind, that Schaeffer gave her a flare, showed her how to use the flare, and that Schaeffer then told her to "go do it."

{¶4} On June 12, 2014, Schaeffer was indicted for Complicity to Aggravated Arson in violation of R.C. 2923.03(A)(2)/(F) and R.C. 2909.02(A)(1)/(B)(2), a felony of the first degree, Complicity to Aggravated Murder in violation of R.C. 2923.03(A)(2)/(F) and R.C. 2903.01(B)/(F), a special felony, Complicity to Murder in violation of R.C. 2923.03(A)(2)/(F), and R.C. 2903.02(B)/(D), a special felony, and Complicity to Attempted Murder in violation of R.C. 2923.03(A)(2)/(F) and R.C. 2923.02(A)/(E)(1) and R.C. 2903.02(B)/(D), a felony of the first degree. (Doc. No. 2).

{¶5} On June 18, 2014, Schaeffer filed a written plea of not guilty by reason of insanity and a request for competency evaluation. (Doc. No. 15). That same day the trial court held an arraignment hearing and the trial court ordered

that Schaeffer should be evaluated by the Court Diagnostic and Treatment Center to determine his competency to stand trial.  (Doc. No. 15).

{¶6} On August 22, 2014, the trial court held a hearing to determine Schaeffer's competency.  After reviewing the report of the Court Diagnostic and Treatment Center and the opinion of Thomas G. Sherman, M.D., the court determined that Schaeffer did have the capacity "to understand the nature and objective of the proceedings against him and [that he did] have the capacity to assist in his defense."  (Doc. No. 30).  In addition, based on the opinion of Dr. Sherman, the trial court determined that Schaeffer was not suffering from a "mental defect at the time of the offense which would have impaired his ability to know the wrongfulness of the acts charged."[1]  (*Id.*)

{¶7} The case ultimately proceeded to a jury trial, which was held October 27-29, 2014.  At trial the State called ten witnesses including the detectives, the coroner, and the fire marshal who investigated the case, the surviving victim from the fire, some of the individuals who were present with Shey Weiker in the hours before the alleged incident, and Shey Weiker, who testified that Schaeffer gave her the flare, showed her how to use it, and told her to "go do it."  Schaeffer called no witnesses but his attorney did extensively cross-examine the majority of the

---

[1] We note that the issue of insanity was not addressed by the parties at trial and was apparently abandoned by Schaeffer.

State's witnesses. After the case was submitted to the jury, the jury returned guilty verdicts on all four counts against Schaeffer.

{¶8} On October 31, 2014, the case proceeded to sentencing. At the sentencing hearing Schaeffer gave a very brief statement that he "just never meant any of this" then his attorney spoke in mitigation. (Oct. 31, 2014, Tr. at 2). Victim statements were then presented to the court and multiple family members of the victims gave statements. The trial court ultimately ordered Schaeffer to serve 10 years in prison for Complicity to Aggravated Arson (Count 1), life imprisonment with parole eligibility after serving 25 years in prison for Complicity to Aggravated Murder (Count 2), 15 years to life in prison for Complicity to Murder (Count 3), and ten years in prison for Complicity to Attempted Murder (Count 4). The court ordered that all the sentences be served concurrently for a total of 25 years in prison before parole eligibility. A judgment entry memorializing this sentence was filed October 31, 2014. (Doc. No. 53).

{¶9} It is from this judgment that Schaeffer appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE DEFENDANT WAS IMPROPERLY CONVICTED OF COMPLICITY TO ATTEMPTED FELONY MURDER WHEN THE CRIME OF ATTEMPTED FELONY MURDER HAS BEEN DECLARED IMPOSSIBLE IN OHIO.**

**ASSIGNMENT OF ERROR 2**
**THE DEFENDANT'S CONVICTION WAS NEITHER SUPPORTED BY THE SUFFICIENCY NOR THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR 3**
**THE TRIAL COURT ERRED BY ASSESSING A RESTITUTION SANCTION WITHOUT CONDUCTING AN ABILITY TO PAY HEARING.**

*First Assignment of Error*

{¶10} In his first assignment of error, Schaeffer argues that he was improperly convicted of Complicity to Attempted Felony Murder (Count 4 of the indictment) because it has recently been determined by the Ohio Supreme Court in *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, that "attempted felony murder" is not a cognizable crime in Ohio. The State actually concedes that based upon *Nolan*, Schaeffer's conviction for Complicity to Attempted Felony Murder should be reversed.

{¶11} In *Nolan*, the Ohio Supreme Court conducted the following analysis in determining that Attempted Felony Murder is not a cognizable crime in Ohio.

> **The issue in this case is \* \* \* whether it is possible to commit "attempted felony murder" in Ohio. For the reasons that follow, we conclude that it is not.**
>
> **\* \* \***
>
> **One obvious requisite of the [attempt] statute is that a person cannot commit an attempt offense unless he or she has acted purposely or knowingly. Thus, to be convicted of an attempt**

-6-

**crime, a defendant must be shown to have attempted to commit the crime and to have acted with the "specific intention to cause a certain result" or the "specific intention to engage in conduct" of a certain nature, R.C. 2901.22(A), or to have acted when "aware that his conduct will probably cause a certain result or will probably be of a certain nature," R.C. 2901.22(B).**

**\* \* \***

**The felony-murder statute imposes what is in essence strict liability. Though intent to commit the predicate felony is required, intent to kill is not. *See State v. Miller,* 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, ¶ 31–33; *State v. Fry,* 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 43 (R.C. 2903.02(B) "does not contain a mens rea component"); *People v. Hernandez,* 82 N.Y.2d 309, 317, 604 N.Y.S.2d 524, 624 N.E.2d 661 (1993) ("The basic tenet of felony murder liability is that the *mens rea* of the underlying felony is imputed to the participant responsible for the killing. By operation of that legal fiction, the transferred intent allows the law to characterize a homicide, though unintended and not in the common design of the felons, as an intentional killing" [citation omitted] ).**

**In sum, an attempt crime must be committed purposely or knowingly and intent to kill need not be proven for the state to obtain a conviction for felony murder, so that a person can be convicted of that offense even though the death was unintended. Thus, this case devolves to an anfractuous question: Can a person be guilty of attempting to cause an unintended death? We conclude that the court of appeals correctly determined that it is impossible to purposely or knowingly cause an unintended death. Accordingly, we hold that attempted felony murder is not a cognizable crime in Ohio.**

*Nolan* at ¶¶ 6-10.

{¶**12**} Based on the Ohio Supreme Court's holding in *Nolan* that Attempted

Felony Murder is not a cognizable crime in Ohio, we find that Complicity to

Attempted Felony Murder cannot be a cognizable crime. A person cannot be complicit in a crime that is not cognizable. As the State does not disagree with this point based upon *Nolan*, we find that Schaeffer's first assignment of error is well-taken and it is therefore sustained.

*Second Assignment of Error*

{¶13} In Schaeffer's second assignment of error, he argues that there was insufficient evidence to convict him of Complicity to Aggravated Arson, Complicity to Aggravated Murder, and Complicity to Murder and that his convictions were against the manifest weight of the evidence.[2]

{¶14} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard,* 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

---

[2] Schaeffer's brief does not actually specify that he is challenging all of his remaining convictions. His assignment of error refers to his "conviction" being the singular form, and at the end of his argument in his brief he requests that this Court find that his "conviction" is against the manifest weight of the evidence. He does not specify which "conviction," he is referring to. However, in the interest of justice we will treat Schaeffer's argument as though he is addressing all three of his remaining convictions (having reversed the conviction as to Count 4 in the previous assignment of error).

**{¶15}** The Ohio Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 10, quoting *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

**{¶16}** Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Thompkins*, *supra*, at 387. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Andrews,* 3d Dist. Allen No. 1–05–70, 2006–Ohio–3764, ¶ 30, quoting *Thompkins* at 387.

**{¶17}** In this case, Schaeffer was convicted of Complicity to Aggravated Arson, Complicity to Aggravated Murder, and Complicity to Murder. Complicity is defined in R.C. 2923.03(A)(2), as

**(A)  No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:**

**∗ ∗ ∗**

**(2)  Aid or abet another in committing the offense;**

**{¶18}** The Ohio Supreme Court defined how a defendant may be convicted of Complicity by aiding and abetting in *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, at syllabus.  In *Johnson*, the Ohio Supreme Court held,

> **"To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant *supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.* Such intent may be inferred from the circumstances surrounding the crime."**

(Emphasis added.)  *Johnson* at syllabus.

**{¶19}** In this case Schaeffer was allegedly complicit in Aggravated Arson, Aggravated Murder, and Murder.  Aggravated Arson is codified in R.C. 2909.02(A)(1), and reads,

**(A)  No person, by means of fire or explosion, shall knowingly do any of the following:**

**(1)  Create a substantial risk of serious physical harm to any person other than the offender;**

**{¶20}** Aggravated Murder, as charged in this case, is codified in R.C. 2903.01(B), and reads,

**(B)   No person shall purposely cause the death of another \* \* \* while committing or attempting to commit \* \* \* kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.**

{¶21} Murder, as charged in this case, is codified in R.C. 2903.02(B), and reads,

**(B)   No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence[3] that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.**

{¶22} In order to convict Schaeffer at trial of Complicity to Aggravated Arson, Complicity to Aggravated Murder and Complicity to Murder, the State called ten witnesses including the principal offender who Schaeffer was allegedly complicit with, Shey Weiker.[4]  Weiker testified that she was currently incarcerated for her crimes related to this incident but prior to being arrested she lived at 151½ Taft Street in Fostoria in an apartment above where Schaeffer lived at 151 Taft Street.   (Tr. at 227).   Weiker testified that she had moved into the upstairs apartment a couple of weeks prior to the incident and that at the time of the incident her 13-year-old son was staying with her.   (*Id*. at 229-230).   Weiker testified that she lived in the apartment above Schaeffer's rent-free in exchange for doing housework and helping Schaeffer take care of Karen, Schaeffer's wife.   (*Id*.

---

[3] Aggravated Arson is an offense of violence according to R.C. 2901.01(A)(9)(a).
[4] Although Weiker was not the first witness called by the State, we elect to present the testimony out of the order in which it was presented by the State to provide the clearest narrative.

-11-

at 233-234). In addition, Weiker testified that she did "odd and end jobs" for Schaeffer such as "scrapping." (Tr. at 230).

{¶23} Weiker testified that on the evening of May 25, 2014, she went to Findlay to the VFW with her boyfriend Jason, Schaeffer's wife Karen, Tim Hall and others to go to a karaoke contest. (Tr. at 234-36). Weiker testified that they were at the VFW for several hours. (*Id.* at 236). Weiker testified that while she was at the VFW she got upset and got into a fight with her boyfriend Jason because he had another girl pick him up and he had text messages on his phone from the girl. (*Id.* at 235). Weiker testified that after the contest, she dropped Jason off at his house because Schaeffer did not like Jason being around, and then she drove back to the Taft Street residence. (*Id.* at 237-238).

{¶24} Weiker testified that at the Taft Street residence there were people on the porch including Karen, Vonda Hall, her son Tim Hall, and Vonda's friend/boyfriend James. Weiker testified that she was still upset at the time and she was venting for a while on the porch while they all smoked marijuana. (Tr. at 238).

{¶25} Weiker testified that at some point the conversation changed to the topic of child molesters, which was a sore subject for Weiker because she "was molested when [she] was little and the guy got away with it." (*Id.* at 239). Weiker testified that she "found out earlier this year that [her] son had been raped," and

that was under investigation by the Fostoria Police Department. (*Id*. at 239). Weiker testified that she vented about child molesters for another hour or so, stating that all child molesters "need shot in their head." (*Id*. at 240). Weiker believed Daniel Marker, the brother of her ex-husband, had been the person who raped her son.

{¶26} Weiker testified that at some point Schaeffer texted her phone and asked her to come inside. (Tr. at 240). Weiker testified that Schaeffer had been inside while the rest of the people were on the porch because Schaeffer "really didn't sit out and associate much with anybody." (*Id*. at 241). Weiker testified that she went into Schaeffer's room and had a discussion with Schaeffer about "burning houses down without leaving evidence." (*Id*. at 242). Weiker testified that they both were talking about it. (*Id*.) Weiker testified that she said she wanted to burn all of the houses down that a child molester lived in, that included the one down the street from them (where Marker lived). (*Id*.) Weiker testified that Schaeffer said "[f]lares don't leave fingerprints" and that he had some on the back porch. (*Id*. at 242). Weiker testified that she "sat there crying until [Schaeffer] told [her] to go get the, get [the flares] on the back porch." (*Id*. at 243). Weiker testified that the flares were in a plastic bag on the back porch. (*Id*.)

{¶27} Weiker testified that she brought the bag of flares to Schaeffer, that Schaeffer took one out of the bag and said, "this is how you use it." (Tr. at 243).

Weiker testified that Schaeffer showed her how to take the cap off and how to use the flare, but he did not actually light it at that time. (*Id*.) Weiker testified that after Schaeffer gave her the demonstration he gave her the flare and told her, "there, go do it." (*Id*. at 244).

{¶28} Weiker testified that she then left Schaeffer's room and went back to the porch and told Timothy Hall to walk with her. Weiker testified that Tim was one of her best friends and she called him her little brother. (Tr. at 245). Weiker testified that as they walked Tim was telling her to use her head and think of her children. (*Id*.) Weiker testified that Tim stopped to "to take a piss" at some point, and she walked off at that time. (*Id*. at 268).

{¶29} Weiker testified that she walked to Marker's house, that she was within 25 feet, and that she "stood there with a flare in [her] hands and all that came to [her] was how [her] son was hurt for so many years." (Tr. at 246). Weiker testified that she then struck the flare and threw it at the house. (*Id*.) Afterward, Weiker testified that she ran away from the immediate vicinity of Marker's residence and that she then walked back toward the Taft Street residence, but she had to wait on a train. (*Id*. at 247). Weiker testified that she met back up with Tim Hall while waiting for the train, and that they then walked back to the Taft Street residence. (*Id*. at 248). Weiker testified that when she returned she went upstairs with her son who was sleeping. (*Id*.)

{¶30} Weiker testified that she stayed upstairs until Schaeffer yelled and told her to look out the window across the tracks, which she did, and she saw a fire. (Tr. at 248-249). Weiker testified that later that day she was taken to the police station and she told them that she got the flare from Schaeffer and that Schaeffer showed her how to strike it that night. (Tr. at 254). Weiker testified that she had never used a flare prior to that night. (*Id.*)

{¶31} Weiker testified that she was indicted for Aggravated Arson, Aggravated Murder, Murder and Attempted Felony Murder. Weiker testified that she pled guilty to all of those crimes, and that she was serving a life sentence with parole eligibility after serving 25 years in prison. (Tr. at 255). Weiker testified that the deal did not require her to testify in this case, and that she was not promised anything by the State in exchange for her testimony. (*Id.*)

{¶32} On cross-examination Weiker testified that earlier in the evening prior to the incident she had tried to commit suicide and was stopped twice, once by her boyfriend and once by Tim Hall. (Tr. at 280). She also testified that she had half a beer on the night of the alleged incident and that she had been smoking marijuana throughout the night.[5] (Tr. at 274).

{¶33} The State also called two witnesses who were on the porch of Schaeffer and Weiker's residence on the night of the incident in question,

---

[5] Weiker testified that she was used to smoking often so that while she was smoking a lot that evening she testified she believed she was not under the influence. (Tr. at 274).

including James Ball, who had never met Weiker or Schaeffer before the night of the incident. Ball testified that on Memorial Day Weekend of 2014, he made arrangements to spend some time with Vonda Hall in Fostoria. (Tr. at 135). Ball testified that he had kept in sporadic contact with Vonda over the years and that he had an on-again off-again relationship with her. (*Id.* at 136). Ball testified that he arrived in Fostoria around 10:30 p.m. and met Vonda at her friend's residence on Taft Street. (*Id.* at 137).

{¶34} Ball testified that he waited at the Taft street residence with Vonda for a while until Vonda's son Tim and others arrived including Shey Weiker and Schaeffer's wife. (Tr. at 138). Ball testified that he had met Tim previously but had not met any of the others. (*Id.* at 139). According to Ball, the others had all gone to a karaoke contest and had just returned. Ball testified that they initially all sat on the porch and talked about karaoke, but at some point the conversation turned negative. (*Id.* at 139-140).

{¶35} Ball testified that talk turned to child molesters. (Tr. at 140). Ball testified that there was a conversation regarding a crippled child molester, strapping him to a wheelchair and throwing him on railroad tracks.[6] (*Id.* at 140). Ball testified that from there they talked about burning down a child molester's

---

[6] It is not clear from Ball's testimony whether this "crippled" child molester was supposed to be Daniel Marker, who Ball did not know. At the sentencing hearing it was indicated that Marker had gotten "so sick [that he] couldn't walk because his feet [were] all swollen, all cut up, * * * seeping puss[.]" (Oct. 31, 2014, Tr. at 9).

-16-

house. (*Id.*) Ball testified that he added to the conversation that using a wick from an oil lamp would allow for a 3-5 minute getaway. (*Id.* at 141). Ball testified that he interpreted the conversation at the time as people "blowing off steam." (*Id.* at 140). He testified that he did not take the conversation seriously. (*Id.* at 140-141).

{¶36} Ball testified that during the conversation Weiker was giddy and agitated, that she kept talking about a guy who molested her kid. (Tr. at 141). Ball testified that Weiker eventually left the porch and went inside for a while then came out of the house with a road flare. (Tr. at 143). Ball testified that Weiker said that she could use it to burn down the house, just "pop this and burn forever." (*Id.* at 143). Ball testified that Weiker was in the house for 10-15 minutes, that when she came out she was outside for 10-15 minutes, and then Weiker left the porch and Tim went with her. (*Id.* at 143-144). Ball testified that he saw Weiker and Tim return again 60-90 minutes later. (*Id.* at 145).

{¶37} Ball testified that he and Vonda were in a vehicle at the Taft Street residence when an elderly gentleman notified them that there was a fire around the corner. (Tr. at 145). According to Ball, Vonda told Schaeffer about the fire and then Ball and Vonda walked over by the fire. (*Id.* at 147). Ball testified that he saw the fire and saw that there were bodies on the sidewalk covered with sheets. (*Id.*) Ball testified that he was shocked. (*Id.*) Ball testified at that moment he realized a general conversation had gotten real and out of control. (*Id.*) Ball

testified that he went to the police department the next morning and was in shock and told them what he knew. (*Id*. at 149).

**{¶38}** On cross-examination Ball testified that Schaeffer was never on the porch, that he had no knowledge that Schaeffer was even at the Taft Street residence until later. (Tr. at 151). Ball testified that Schaeffer was not present during the conversation on the porch about burning a house down. (*Id*.)

**{¶39}** The State also called Tim Hall, who was at the Taft Street residence on the porch on the night/early morning of the alleged incident. Hall testified that he was close friends with Weiker and that they had a brother-sister-like relationship. (Tr. at 191). Hall testified that he was currently incarcerated serving 30 months for Obstructing Justice due to his involvement with this incident. (*Id*. at 190).

**{¶40}** Hall testified that up until about 3 weeks prior to the alleged incident he lived at 151 Taft Street with his mother Vonda above Schaeffer's residence (the residence Weiker occupied at the time of the incident). (Tr. at 191). Hall testified that he and Weiker occasionally did work for Schaeffer at a scrap yard, and that Schaeffer paid them under the table. (*Id*. at 192).

**{¶41}** Hall testified that on the evening of the alleged incident he went to a karaoke contest in Findlay along with Weiker, Weiker's boyfriend, Schaeffer's wife, and some other friends. (Tr. at 198). Hall testified that at the VFW Weiker

got into a fight with her boyfriend Jason, but eventually calmed down and drove them back to Taft Street after the karaoke contest. (*Id.* at 199). Hall testified that when they got back to Taft Street, Vonda and James Ball were there on the porch chatting, and Weiker started talking about burning down houses, and brought up Marker's name. (*Id.* at 200). According to Hall, Weiker initially said she would use Kleenexes to start the fire, and they had a discussion of how they would burn down a house. (*Id.*)

{¶42} Hall testified that Weiker eventually left the porch when she got a text from Schaeffer that said "come here K." (Tr. at 202). Hall testified that Weiker was inside for approximately 15 minutes, that she was "heated again" when she came out, and that she had a flare. (*Id.* at 203). Hall testified that Weiker waved the flare around and sat down on the porch for 15 minutes with the flare in her lap. (*Id.* at 204). Hall testified that Weiker then got up and asked Hall to walk with her up the street. (*Id.* at 205). Hall testified that he initially let her walk without him but that he ended up following along and catching up to her, and told her to "think about [her] kids." (*Id.*) Hall testified that Weiker turned up an alleyway and said that no matter what happened she was going to burn down the house, and she started walking toward Marker's house. (*Id.* at 206). Hall testified that he walked away, and Weiker initially came running back to him because the porch light was on at Marker's residence and it scared her. (*Id.*) Hall testified that

he tried to get Weiker to walk back to the Taft Street residence but she walked away and was gone 10-15 minutes the second time. (*Id*.)

**{¶43}** Hall testified that Weiker no longer had the flare when he saw her again, but she had the cap to the flare. (Tr. at 207-208). Hall indicated that Weiker gave him the flare cap and he threw it down a sewer drain. (*Id*. at 212).

**{¶44}** Hall testified that they went back to the Taft Street residence and Schaeffer said to him that what Weiker did was her business and if Hall talked about it Schaeffer "would put [him] six feet under." (Tr. at 210). Hall testified that he took Schaeffer "very serious." (*Id*. at 211).

**{¶45}** Hall testified ultimately that he was currently incarcerated for his disposal of the flare's cap and for making a false statement to a detective. (Tr. at 212).

**{¶46}** On cross-examination Hall testified that he did not take Weiker seriously when she first spoke about burning down a house because Weiker had talked about doing "dumb stuff" before. (Tr. at 219). Hall testified that even when Weiker came back to him with only the flare cap he still thought she was lying. (*Id*. at 224).

**{¶47}** The State also called several officers who were involved in this case, including Detective Shilo Frankart. Detective Frankart testified that he was a detective for the Fostoria Police Department and that he was assigned to this case.

(Tr. at 330). Detective Frankart testified that while he was canvassing the scene of the fire he was advised by dispatch that James Ball wanted to speak with him. (*Id.* at 335). Detective Frankart testified that he spoke with Ball and then spoke with other people who were present at the Taft Street residence including Vonda Hall, Tim Hall, and Shey Weiker. (*Id.* at 335-340). Detective Frankart testified that he then interviewed Schaeffer. (*Id.* at 342). That interview recording was played for the jury. (State's Ex. 3).

{¶48} In the interview Schaeffer stated that he paid Weiker to do laundry and be a housekeeper and to help out with his wife. (State's Ex. 3). Schaeffer stated that he was under the belief that Weiker's son had been molested by Marker. (*Id.*) Schaeffer stated that on the evening of the alleged incident he stayed at home while his wife went to karaoke with Weiker and that they all came home late. (*Id.*) Schaeffer stated that later after they got home he went upstairs to talk with Weiker about "gas" and that he was "rubbing" her back, legs and feet. (*Id.*) Schaeffer stated that he did not have a sexual relationship with Weiker but that he wanted to if his wife passed on.[7] (*Id.*) Schaeffer stated that Weiker did not say anything about the fire and the first he heard of it was when Vonda Hall came up and said there was a fire. (*Id.*) During the interview Schaeffer indicated

---

[7] Schaeffer indicated that his wife was in poor health with (what sounds like he says) rheumatoid arthritis and that she would not "be around real long."

that he had a surveillance system at his house, that recorded the porch and other areas to a DVR system linked to his bedroom. (*Id.*)

{¶49} Later in the interview Schaeffer stated that he did text Weiker and ask her to come inside around 2 a.m. when Weiker was on the porch with others. (*Id.*) Schaeffer stated that Weiker was upset about Marker and that the police were not doing anything for her son. (*Id.*) Schaeffer stated that he and Weiker talked about different ways to light a fire but he did not show her how to light a flare. (*Id.*) Schaeffer stated that it was actually 2-3 weeks prior to the incident that he showed Weiker how to use a flare to burn wire. (*Id.*) However, when pressed later, Schaeffer stated that he "might of" showed her again how to use a flare that night. (*Id.*) Schaeffer said he never expected that Weiker would kill someone. (*Id.*)

{¶50} After the interview Detective Frankart testified that he spoke with Weiker again. (Tr. at 358). Detective Frankart also testified that since he learned that Schaffer had a surveillance system at his house he attempted to check that surveillance system for any useful information but it had already been taped over or deleted. (*Id.* at 355).

{¶51} The State also called Detective Gabriel Wedge of the Fostoria Police Department. Detective Wedge testified that he helped Detective Frankart investigate this case. (Tr. at 159). Detective Wedge testified that he typed up the

warrant for the Taft Street residence and was involved in executing that warrant. Photographs of the Taft Street residence, its interior and the porch were introduced into evidence.[8] (*Id.* at 161). Detective Wedge testified that he found flares or "fusees" at Schaeffer's residence where they had been indicated they would be. (*Id.* at 167). Detective Wedge testified that they were extremely flammable. (*Id.* at 172).

{¶52} Detective Wedge testified that he was notified that a fussee may have been used to start the fire and that a flare cap had been put down a specific sewer drain in the middle of the road. (Tr. at 175). Detective Wedge testified that he searched the specified sewer drain and found the fusee cap. (*Id.*) That cap was photographed and introduced into evidence. (*Id.* at 175-177). Daniel Davison of the BCI Lab division testified at trial that the cap recovered from the sewer drain was comparable to the flares recovered from Schaeffer's home. (*Id.* at 288).

{¶53} The State also called the first officer to respond to the scene of the fire at Marker's residence, officer Trey Farabee of the Fostoria City Police Department. Officer Farabee testified that he was working the midnight shift on May 26, 2014, when he learned of a fire. (Tr. at 128). He testified that he got into his cruiser and drove to the house, which was completely engulfed in flames when he arrived. (*Id.* at 129). Officer Farabee testified that since the front door was

---

[8] Detective Wedge testified, and the photographs made clear, that Schaeffer's residence was extremely cluttered. As Schaeffer did a lot of "scrapping" work, there were objects on nearly every surface of his household.

barred by the flames, he checked other exits to the house, and at the back of the house he found a female on the ground underneath a window. (*Id*. at 130). Officer Farabee testified that the female had burns and cuts on her and that she did not respond when he attempted to communicate with her. (*Id*.)

{¶54} Officer Farabee testified that he moved the female with the help of a citizen, and learned from another individual who had showed up that the woman was deaf. (*Id*. at 131). Officer Farabee testified that the fire department eventually responded and treated the victim, and went into the house and brought out two individuals on backboards. (*Id*. at 133). Officer Farabee testified that one of the two other victims was briefly resuscitated in the ambulance. (*Id*. at 134).

{¶55} Frank Reitmeier, a State Fire Marshall's investigator, testified that he investigated the scene of the fire. (Tr. at 293). Reitmeier testified that there were two fatalities and one injury. (*Id*. at 295). Reitmeier testified that his investigation established that the fire started on the front porch. (*Id*. at 298). Photographs of the fire's aftermath were introduced into evidence, including photographs of the back door to Marker's residence. The back door had been screwed shut prior to this incident (not by anyone involved in this crime) and it was unable to be opened from the inside. (*Id*. at 322).

{¶56} Reitmeier testified that he interviewed Weiker, who initially denied involvement in the fire, but later stated that she started the fire and that she used a

flare or "fusee" to start the fire. (Tr. at 312-313). Reitmeier testified that the fusee could have started the fire and that the fire's origin was incendiary. (*Id*. at 316). Reitmeier testified that it was his conclusion that Weiker started the fire. (*Id*.) Reitmeier testified on cross-examination that he would not have been able to tell a fusee was used to start the fire had he not been told because it would have been completely burnt away. (*Id*. at 318).

{¶57} Dr. Cynthia Beisser, of the Lucas County Coroner's Office testified to a reasonable degree of medical certainty that Daniel Marker and Tara Vance both died from carbon monoxide poisoning as a result of the house fire. (Tr. at 395).

{¶58} The last witness the State called was Dana Weatherall. Weatherall testified through an interpreter that at the time of the incident she was living with her girlfriend Tara and Marker at Marker's residence. (Tr. at 404). Weatherall testified that her girlfriend knew Marker from when they both attended Ohio School for the Deaf. (*Id*.)

{¶59} Weatherall testified that on the evening of the fire her girlfriend was asleep and she was playing games on the computer. (*Id*. at 405). She testified that Marker eventually came to her and said there was a fire but he did not call 911. (*Id*.) Weatherall testified that Marker, his dog, and Weatherall's girlfriend were all killed in the fire. (*Id*.) Weatherall testified that she got out by jumping out of

the back window. (*Id.*) Weatherall testified that she had a lot of cuts and was in the hospital for four days due to skin being burned off and having difficulty breathing from the smoke. (*Id.* at 406).

{¶60} After Weatherall testified, the State rested its case. Schaeffer then made a Crim.R. 29 motion for acquittal, arguing that the State did not present sufficient evidence to convict him. The trial court overruled his motion. Schaeffer now renews his argument on appeal, contending that Weiker did not directly leave Schaeffer's presence and go commit the act. Schaeffer claims that there was a "significant intervening time" on the porch before she committed her crimes, and that she was not goaded into doing it by Schaeffer. Schaeffer also claims that he did not show Weiker how to use the flares on the night of the incident, but rather weeks earlier as he indicated in his police interview.

{¶61} Despite Schaeffer's arguments, the jury heard testimony from the principal offender that Schaeffer called her into her house and that the two of them discussed burning down a child molester's home. Unlike the general discussion on the porch that some may not have taken seriously, Schaeffer then told Weiker to go get flares that were on his back porch. Schaeffer then showed Weiker how to use the flares, said that they would not leave any evidence, and then told her to "go do it." Schaeffer thus gave Weiker the physical means to commit the crime by the flare, showed her how to use the flare, and then encouraged her to go burn

down the house. That there may have been up to fifteen minutes before Weiker left the residence in the early morning hours according to witnesses to walk toward the Marker residence does not alter Schaeffer's involvement in the crime.

{¶62} Thus the State presented sufficient evidence that, *when looked at in a light most favorable to the prosecution*, a reasonable factfinder could use to determine beyond a reasonable doubt that Schaeffer aided or abetted Weiker in committing Aggravated Arson, Aggravated Murder and Murder. Therefore, Schaeffer's sufficiency arguments on these issues are not well-taken.

{¶63} Schaeffer next argues that his convictions were against the manifest weight of the evidence. In arguing that his convictions were against the weight of the evidence, Schaeffer reasserts the same arguments made when claiming that there was insufficient evidence to convict him and, in addition, argues that the jury struggled with these issues because the jury asked multiple questions while deliberating. Schaeffer suggests that the Court's instructions, answers to the jurors' questions during deliberations, and the evidence fail to support the jury's finding that Schaeffer "shared the criminal intent of the principal" on each of the three charges of Aggravated Arson, Aggravated Murder, and Murder.

{¶64} According to the Ohio Supreme Court's decision in *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, aiding or abetting can be proven by showing that Schaeffer "supported, assisted, encouraged, cooperated with, advised, or

incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." Thus the State had to establish that Schaeffer assisted Weiker in committing the crimes, *and* that Schaeffer shared Weiker's criminal intent, if applicable for the offense.

{¶65} For the Complicity to Aggravated Arson and the Complicity to (Felony) Murder convictions, the State had to prove that Schaeffer aided or abetted Weiker and shared in Weiker's intent to knowingly cause a fire that created a substantial risk of serious physical harm for the Complicity to Aggravated Arson, and that the fire did in fact cause the death of Tara Vance for the Complicity to (Felony) Murder. There is ample evidence in the record to support that Schaeffer knowingly assisted Weiker in causing the fire when he gave her a flare, told her how to use it, and told her to "go do it" shortly before Weiker started the fire. It is also evident that Tara Vance died in the fire that Schaeffer knowingly assisted Weiker in starting. Thus we cannot find that either the conviction for Complicity to Aggravated Arson or the conviction for Complicity to (Felony) Murder was against the weight of the evidence. Schaeffer's arguments as to these two convictions are not well-taken.

{¶66} However, for the Complicity to Aggravated Murder conviction, the State had to show mental intent beyond Schaeffer's willingness to help Weiker start the fire at Marker's residence. To prove that Schaeffer was guilty of

Complicity to Aggravated Murder, the State had to show that Schaeffer shared Weiker's *intent* to *purposely* cause the death of Marker by means of the Aggravated Arson. *See State v. Herring*, 94 Ohio St.3d 246, 249-250, 2002-Ohio-796 (holding that purpose is an essential element of Aggravated Murder, and that Complicity by Aiding and Abetting requires that the defendant share the criminal intent of the principal).

**{¶67}** The evidence that the State presented in this case to establish that Schaeffer shared Weiker's intent to purposely cause the death of Marker consists of the following. Weiker had a conversation on Schaeffer's porch about wanting to kill all child molesters and about ways to burn down child molesters' homes. Schaeffer was not present on the porch for this conversation, but according to his interview, he was in his bedroom watching the people on the porch through his surveillance equipment. Schaeffer's surveillance equipment did not have audio, but Schaeffer presumably heard some of the conversation because he messaged Weiker and told her to come inside at one point, and then discussed ways to light a fire with her in a manner that would leave no evidence, which was one of the subjects of conversations from the porch. Thus a jury could reasonably infer from the sequence and timing of these events that Schaeffer had overheard the discussion on the porch, and Weiker's conversation about wanting to kill child molesters, Marker in particular.

{¶68} In addition, Schaeffer admittedly had feelings for Weiker, and was aware that her son had allegedly been molested by Marker. Thus, a jury could reasonably conclude that Schaeffer was aware from the circumstances that Weiker desired to kill Marker despite the fact that in testifying about her conversation with Schaeffer shortly before the incident, Weiker did not indicate that she expressed her specific purpose to kill Marker at that time but only that she had expressed the desire to burn down all the houses of child molesters, including the "one up the street." Nevertheless, given that it very was late at night (or early in the morning), Schaeffer would be presumed to know that Marker was home and that any fire he was assisting Weiker in starting was intended to kill Marker.

{¶69} Lastly, there were Schaeffer's actions after the fire. When Tim Hall returned to Schaeffer's residence after Weiker started the fire, Schaeffer threatened Hall, stating that what happened was Weiker's business and that if Hall told anyone Schaeffer would put him "six feet under." These statements perhaps indicated that Schaeffer was aware of what Weiker had set out to do when she left his residence with the flare.

{¶70} On the other hand, James Ball testified that he thought Weiker was only joking and blowing off steam when she was on the porch talking about wanting to kill all child molesters. Tim Hall testified that he thought Weiker would not go through with burning down the Marker residence. He testified that

even when Weiker came back from Marker's residence with only the fusee cap, he still did not believe she had burned down the house.

{¶71} In any event, Weiker herself testified that she did not know for sure that Marker was home at the time she started the fire. She also testified that she did not know other people were inside the home, or who was inside of it at the time. In addition, she testified that when she threw the flare, she knew it would cause a fire, but she did not know the fire "would be like that," meaning that she did not know it would so quickly engulf the house in flames. In fact, Hall testified that Weiker first hesitated and walked away from Marker's house when she noticed the porch light was on and then returned and threw the flare anyway, thus possibly indicating her purpose to kill might not have fully formed until after she left Schaeffer's residence.

{¶72} Additionally, Weiker's testimony gave no indication that during her conversation with Schaeffer shortly before the incident she intended to kill Marker. In fact, according to her testimony, she never mentioned Marker's name to Schaeffer during that conversation; she merely referred to her son being molested, and referred to wanting to burn down the homes of all child molesters, including the "one up the street."

{¶73} Furthermore, in the lengthy interview with Schaeffer that was played for the jury, Schaeffer admits that he had a conversation with Weiker before the

fire was started, and that at one time he showed her how to light a flare, but he never indicated that he specifically had any desire to kill Marker or anyone else. Schaeffer also states multiple times in the interview that it was not his intention at all to kill people, that he did not think Weiker was really going to burn down the house, and that he never expected what happened to happen. He specifically stated, "I didn't think she was going to go kill somebody."

**{¶74}** On balance, there is a plausible path to the jury's conclusions in this case and we cannot say that the jury's verdict as to Aggravated Murder is against the weight of the evidence. Nevertheless, the evidence in support of finding that Schaeffer acted with the specific intent to assist Weiker in purposely causing the death of Marker is not overwhelming and requires inferences to be made from several circumstantial sources.

**{¶75}** Unfortunately, the lack of overwhelming evidence as to Schaeffer's specific intent to kill is a concern that is compounded by the fact that the instructions provided to the jury did not accurately reflect the essential elements of Complicity to Aggravated Murder. When the case was submitted to the jury, the jury was given the following instruction on what it had to find in order to convict Schaeffer of Complicity to Aggravated Murder.

> **Count Two. Complicity to Aggravated Murder. The defendant is charged with Complicity to Aggravated Murder. Before you can find the defendant guilty you must find beyond a reasonable doubt that on or about the 26th day of May, 2014, in Seneca**

**County, Ohio, the defendant aided Shey Weiker in committing the offense of aggravated murder. Aggravated murder being that *Shey Weiker* purposely caused the death of Daniel J. Marker while committing the offense of aggravated arson.**

**Again "aid or abet" means supported, assisted, encourage[d], cooperated with, advised, or incited Shey Weiker to commit the offense.**

**Purposely. A purpose is an essential element of the offense of aggravated murder.**

**A person acts purposely when it is *her* specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of *Shey Weiker* a specific intention to purposely cause the death of Daniel J. Marker while committing the offense of aggravated arson.**

**Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to *herself* unless *she* express[es] it to others or indicates it by *her* conduct.**

**The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means used, and all the other facts and circumstances in evidence.**

(Emphasis Added.) (Tr. at 444-445).

{¶76} The jury instruction that was given to the jury for Complicity to Aggravated Murder clearly requires the jury to find that *Weiker* specifically intended to kill Marker, but it contains no culpability element for *Schaeffer*. There is no indication in the preceding instruction that Schaeffer had to share Weiker's

criminal intent to purposely cause the death of Daniel Marker. At the outset, we note that this is contrary to the model Ohio Jury Instructions, CR 523.03, regarding Complicity, which provides,

> **1.    The defendant is charged with complicity in the commission of the offense of (*specify offense*).  Before you can find the defendant guilty, you must find beyond a reasonable doubt, that on or about the ____ day of ____, and in _____ (County) (*Other jurisdiction*), Ohio, the defendant (*insert applicable culpable mental state if one is required for the commission of the principal offense*)**
>
> **(*Use appropriate alternative[s]*)**
>
> **\* \* \***
>
> **(A)(2) (aided or abetted) another in committing the offense of (*specify offense*).**
>
> **\* \* \***

(Underline added, italics in original).   *Ohio Jury Instructions*, CR Section 523.03(1)(A)(2) (Rev. Dec. 10, 2011).

{¶77} More importantly, the omission of any reference to Schaeffer's mental state or purposeful culpability in this instruction is directly contrary to the decisions of the Ohio Supreme Court in *Johnson* and *Herring*, *supra*, which clearly require that to be convicted of Complicity it must be established that the accomplice "share the criminal intent of the principal"—which in this case required the jury to find that Schaeffer "shared in the purpose to kill" exhibited by

Weiker. Yet the jury was never instructed that Schaeffer had to have any such intent or even that he be aware of Weiker's intent to kill, but rather only that *Weiker* be found to have had a purpose to kill. Failure to instruct the jury on the requisite mental state attached when determining Complicity to a crime has been found to be error. *See State v. Noor*, 10th Dist. Franklin No. 13AP-165, 2014-Ohio-3397, ¶¶ 36-55 (finding where jury instructions for Complicity specifically challenged, failure to instruct on culpable mental state was error, albeit ultimately harmless under the facts and weight of the evidence in that case).

{¶78} Ironically the trial court did instruct the jury as to the requirement of shared criminal intent by the accomplice as to both the Aggravated Arson and Felony Murder counts in this case but did not do so with regard to the Aggravated Murder count.[9]

{¶79} In addition to the lack of a defined mental state for Schaeffer in the instructions, the instructions were also potentially confusing due to the definition of "purposely" that was used. The element of purpose related to Complicity to Aggravated Murder was the specific subject of one of the jury's questions asked during deliberations. In the jury instruction excerpted above that was used in this

---

[9] For Complicity to Aggravated Arson, there was a segment in the instruction that read, "[y]ou will determine from these facts and circumstances whether there existed at the time in the mind of *the defendant* an awareness of the probability that he was aiding and abetting Shey Weiker in committing aggravated arson." (Emphasis added.) (Tr. at 443). Similarly, the Complicity to (Felony) Murder instruction read in relevant parts, "you must find beyond a reasonable doubt that *the defendant*, by aiding or abetting Shey Weiker * * * did, by fire knowingly create a substantial risk of serious physical harm to any person other than herself" which ultimately "caus[ed] the death of Tara Lynn Vance as a proximate result of committing [the] aggravated arson[.]" (Tr. at 445-446).

case, the instructions stated "a person acts purposely when it is *her* specific intention to cause a certain result." (Emphasis added.) (Tr. at 444). While the trial court could have been using the pronoun "her" to be politically correct, it is potentially confusing in that it makes it seem as though only Weiker's "purpose" mattered for proving Complicity to Aggravated Murder. This is further problematic as the next sentence states that it must be established that *Weiker* specifically intended to purposely cause the death of Marker. And in the next paragraph the jury was instructed that, "[t]he purpose with which a person does an act is known only to *herself* unless *she* express[es] it to others or indicates it by *her* conduct."

**{¶80}** When read as a whole, these instructions seem to indicate that it was only required for Weiker to possess the specific intent to kill Marker, which is simply not correct. It was required that Weiker purposely cause the death of Marker, so the instructions are correct on that point, but it was *also* required for the jury to find that Schaeffer shared the purpose to cause the death of Marker. These instructions simply do not indicate that fact.

**{¶81}** Thus the jury in reading the instruction for Complicity to Aggravated Murder could have determined that as long as Schaeffer aided and abetted Weiker by assisting her in any manner, and as long as the jury could conclude that Weiker purposely killed Marker, Schaeffer could be guilty of Complicity to Aggravated

Murder without the State establishing that Schaeffer also shared the intent to purposely kill Marker. This would substantially alter the State's required burden.

**{¶82}** That there was confusion on this culpability component was evident, as Schaeffer argues in this appeal, by the jury's questions after the case was submitted to them for deliberations. The jury asked a number of questions, one of which was, "We see on page 17 a discussion of all the essential elements. We see on page 11 under [count] two, purposely, a purpose is an essential element. Are all the numbers and letters under each count the essential elements?" (Tr. at 6).

**{¶83}** After a multi-page discussion on what the proper response should be, the trial court ultimately agreed to respond as follows.

> **The first paragraph after each heading for the various counts includes all of the essential elements. The numbers and letters define many of those words and phrases in the first paragraph.** * * *
>
> * * *
>
> **Purposely is an essential element to Count Two, Aggravated Murder. It is not an essential element to the other counts.**

(Tr. at 12).

**{¶84}** The trial court's answer to the jury's question thus emphasized that "purpose" was an essential element of Complicity to Aggravated Murder; however, it in no way clarified that not only Weiker but Schaeffer also had to act with purpose to cause the death of Marker. A juror could take the trial court's

answer to its question and simply think that Weiker had to act purposely as set forth in the original instructions, and that satisfied the only finding of purpose necessary to convict Schaeffer.

**{¶85}** While Schaeffer did not object to the jury instructions at trial, we note that the State and Schaeffer's counsel had each submitted proposed jury instructions prior to the trial, and Schaeffer's proposed jury instruction contained a culpable mental state for Schaeffer (albeit the wrong one) in the Complicity to Aggravated Murder portion while the State's proposed instructions did not contain a culpable mental state.[10] We also note that Schaeffer did object to the answer to the jury question regarding purpose. Nevertheless, because Schaeffer did not object to the original jury instructions *per se* and thus failed to comply with Crim.R. 30, we will review this matter under a plain error standard.[11]

**{¶86}** Under Crim.R. 52 "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To constitute plain error, the error (1) must be a deviation from the legal rule, (2) must be an obvious defect in the trial proceedings, and (3) must have

---

[10] Schaeffer's proposed jury instruction read that he had to have "knowingly aided or abetted [Weiker] in committing the offense of Aggravated Murder, by purposely caus[ing] the death of Daniel J. Marker while committing the offense of Aggravated Arson. (Doc. No. 47). It is not clear why he used "knowingly" as his culpable mental state in the proposed instruction. The State's proposed instruction was similar to the final instruction in that it simply said that the jury had to find that "the defendant aided [Weiker] in committing the offense of aggravated murder. Aggravated murder being that Shey Weiker purposely caused the death of Daniel J. Marker while committing the offense of aggravated arson." (Doc. No. 48).

[11] Criminal Rule 30(A) reads, in pertinent part, "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury."

affected the defendant's substantial rights. *State v. Payne,* 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 16; *State v. Dominguez,* 12th Dist. Preble No. CA2011–09–010, 2012-Ohio-4542, ¶ 26. "Plain error does not exist unless the appellant can establish that the outcome of the trial would have been different but for the trial court's allegedly improper action." *Dominguez* at ¶ 26 (citation omitted); *State v. Waddell,* 75 Ohio St.3d 163, 166 (1996). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91 (1978), paragraph three of the syllabus; *State v. Phillips,* 74 Ohio St.3d 72, 83 (1995).

**{¶87}** Conversely, an error is harmless where it "does not affect substantial rights" and it "shall be disregarded." Crim.R. 52(A). " '[T]he cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.' " *State v. Noor*, 10th Dist. Franklin No. 13AP-165, 2014-Ohio-3397, ¶ 53, quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, fn. 5 (1983).

**{¶88}** Here, the State elected to proceed on Complicity to Aggravated Murder, which required *proof beyond a reasonable doubt* that Schaeffer shared Weiker's intent to purposely cause the death of Daniel Marker. Based on the evidence before us and the flawed jury instruction we simply cannot say with the requisite degree of certainty that this jury found the element of specific purpose to

kill *on behalf of Schaeffer* beyond a reasonable doubt. As noted earlier, it is our conclusion that the evidence in this case could support a determination by the jury that Schaeffer purposely aided Weiker in committing the Aggravated Murder. But as the evidence is not overwhelming and there is a clear error in the jury instructions omitting an essential element, we are compelled to find plain error.

{¶89} In the past this Court has similarly found that an inadequate jury instruction constituted plain error. *State v. Harvey*, 3d Dist. Marion No. 9-04-69 2005-Ohio-3882, ¶¶ 5-8. In *Harvey*, this Court determined that where a jury instruction did not set forth all of the essential elements of an offense, specifically omitting the word "deadly" from possessing a deadly weapon, plain error resulted. *Harvey* at ¶ 7.

{¶90} Therefore, to the extent that the assignment of error argues that any conviction of Aggravated Murder is against the weight of the evidence in this case, Schaeffer's second assignment of error is overruled. However, based solely upon the flawed jury instruction we find that Schaeffer's second assignment of error is well-taken to the extent that his conviction must be reversed and remanded for a new trial for Complicity to Aggravated Murder. Accordingly, his second assignment of error is overruled in part, and sustained in part.

*Third Assignment of Error*

**{¶91}** In Schaeffer's third assignment of error, he argues that the trial court erred in ordering restitution, costs, and fees when Schaeffer was serving a life sentence and had no ability to pay. Specifically, Schaeffer argues that the trial court should have conducted an "ability to pay hearing."

**{¶92}** In this case Schaeffer was ordered to pay restitution to various victims including Nancy Marker, the Hanney Funeral Home, "Angel," Brian Marker, and Dana Weatherall. The total amount of restitution ordered was $54,429.45. Due to our disposition of the first and second assignment of error Schaeffer will have to be resentenced and thus restitution will have to be re-addressed at the new sentencing hearing. This assignment of error is thus rendered moot, and we decline to further address it.[12]

**{¶93}** For the foregoing reasons Schaeffer's first assignment of error is sustained, his second assignment of error is overruled in part and sustained in part, and his third assignment of error is rendered moot. Having found error prejudicial to Schaeffer in the first and second assignments of error, we affirm in part and

---

[12] As Schaeffer's convictions related to victims Dana Weatherall and Daniel Marker have been reversed, restitution ordered related to them would likely no longer be proper. In addition, the funeral home is not a "victim" of the crime. Regardless, we would note that there is no clear indication in the record of who "Angel" was that was supposed to receive restitution, or where the trial court received its restitution figures. There was no testimony regarding restitution at the sentencing hearing, and the transcript indicates that the restitution was based on a "submission of restitution that was already submitted." (Tr. at 14). It is not clear whether the restitution "already submitted" was based upon documents that were submitted to the trial court in this case that were not included in the record transmitted to this Court along with the sentencing hearing transcript, or if it is referring to documents that were submitted to punish the principal offender Shey Weiker and order her to pay restitution.

reverse in part the trial court's judgment, and remand this case for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**ROGERS, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**