[Cite as *State v. Worthington*, 2016-Ohio-530.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HARDIN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

ANDREW CURTIS WORTHINGTON,

    DEFENDANT-APPELLANT.

CASE NO. 6-15-04

O P I N I O N

Appeal from Hardin County Common Pleas Court
Trial Court No. 20142152-CRI

**Judgment Affirmed**

**Date of Decision: February 16, 2016**

**APPEARANCES:**

    *Michael J. Short* for Appellant

    *Jason M. Miller* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Andrew Worthington ("Worthington") brings this appeal from the judgment of the Court of Common Pleas of Hardin County convicting him of Kidnapping and Felonious Assault of a Peace Officer. Worthington claims that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Worthington also claims that he was denied effective assistance of counsel. For the reasons set forth below, the judgment is affirmed.

*Procedural Background*

{¶2} On September 24, 2014, the Hardin County Grand Jury indicted Worthington on eight counts: 1) Abduction in violation of R.C. 2905.02(A)(1), a felony of the third degree; 2) Abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree; 3) Kidnapping in violation of R.C. 2905.01(A)(1), a felony of the first degree; 4) Kidnapping in violation of R.C. 2905.01(A)(3), a felony of the first degree; 5) Felonious Assault in violation of R.C. 2903.11(A)(2), a felony of the second degree; 6) Felonious Assault of a Peace Officer in violation of R.C. 2903.11(A)(2), (D)(1), a felony of the first degree; 7) Criminal Damaging or Endangering in violation of R.C. 2909.06(A)(1), a misdemeanor of the second degree; and 8) Assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree. Doc. 2. The trial court later dismissed counts one and two and renumbered the remaining charges from one to six respectively. Doc. 34. A jury

trial was held on April 8 and April 9, 2015. Doc. 50. Once the State rested its case, the trial court dismissed Counts two, three, five, and six. *Id.* The trial court allowed counts one and four to be presented to the jury. *Id.* At the conclusion of the trial, the jury found Worthington guilty of Kidnapping in violation of R.C. 2905.01(A)(1) and Felonious Assault on a Peace Officer in violation of R.C. 2903.11(A)(2), (D)(1). Doc. 38 and 39.

**{¶3}** A sentencing hearing was held on May 12, 2015. Doc. 58. The trial court sentenced Worthington to four years in prison on each count and ordered that the sentences be served consecutive to each other. *Id.* Worthington filed a timely notice of appeal. Doc. 63. On appeal he raises the following assignments of error.

**First Assignment of Error**

**[Worthington] received ineffective assistance of trial counsel.**

**Second Assignment of Error**

**The convictions are not supported by the weight of the evidence.**

**Third Assignment of Error**

**The convictions were not based on sufficient evidence.**

For the purpose of clarity, the assignments of error will be addressed out of order.

**{¶4}** Both the second and third assignments of error challenge the conviction based on the evidence. Thus, the first step is to address what the evidence at trial was.

*Trial Evidence*

**{¶5}** The first witness for the State was Worthington's mother, Helen Worthington ("Helen"). Helen testified that on the day in question, she took Mandy Steele ("Steele") into the home to retrieve her belongings. Vol. I Vol. 1 Tr. 34. Steele wished to retrieve her belongings because she had ended her relationship with Worthington. Vol. I Vol. 1 Tr. 35. When Worthington started talking with Steele, he seemed upset. Vol. I Vol. 1 Tr. 42-43. Then Worthington pushed Steele. Vol. I Vol. 1 Tr. 43. Later the matter escalated, Helen was locked out of the house, and Steele was still in the house with Worthington. Vol. I Vol. 1 Tr. 48-49. Helen testified that although she never saw a knife, she believed that Worthington had one because he had a cut on his neck. Vol. I Vol. 1 Tr. 57-58.

**{¶6}** On cross-examination, Helen testified that Steele was already upstairs retrieving her belongings when Worthington arrived at the home. Vol. 1 Tr. 67. Worthington then went upstairs where Steele was. Vol. 1 Tr. 68. When Steele and Worthington started coming down the stairs, they were arguing and she attempted to stop the argument. Vol. 1 Tr. 72-73. According to Helen, she had the police called because she was worried about Worthington and his behavior had been odd recently. Vol. 1 Tr. 74. When Helen and the police entered the home, she saw Worthington at the top of the stairs, but did not see Steele. Vol. 1 Tr. 75. Helen testified that Worthington had his hand to his neck as if he were going to

harm himself. Vol. 1 Tr. 76. Helen testified that she did not see or hear any threatening comments or actions toward Steele. Vol. 1 Tr. 76.

{¶7} Charles Mulligan ("Mulligan") testified that he is a deputy with the Hardin County Sheriff's Department. Vol. 1 Tr. 113. He went to the Worthington house in response to a reported domestic dispute. Vol. 1 Tr. 114. Worthington was behind a closed door speaking to them. Vol. 1 Tr. 118. Worthington refused to come out and stated that he was afraid the officers would kill him. Vol. 1 Tr. 119. Mulligan testified that Worthington threatened them with a pit bull and stated they would have to "come in to kill him." Vol. 1 Tr. 119. When they forcefully entered the room, they found Worthington hiding behind the door with his hands to his throat. Vol. 1 Tr. 130. Worthington was repeatedly asked to show his hands, but he refused to do so. Vol. 1 Tr. 130-31. While trying to approach Worthington, he was kicking at the officers, so another officer "tased" him. Vol. 1 Tr. 132. Worthington then reached around with the knife and Mulligan reached for the hand holding the knife. Vol. 1 Tr. 133. Mulligan received a cut on his thumb while removing the knife from Worthington's hand. Vol. 1 Tr. 134. Mulligan believed that Worthington had been attempting to stab Mulligan's leg when the hand was grabbed. Vol. 1 Tr. 133. The State also had Mulligan identify the video from his body camera and the video was played for the jury. Vol. 1 Tr. 144, 148.

{¶8} On cross-examination, Mulligan testified that when he arrived Worthington was at the top of the stairs and later went into the bedroom. Vol. 2 Tr. 5. Based upon the video they had of the room prior to the forced entry, Mulligan knew that Steele was on the right side of the bedroom and Worthington was to the left of the door. Vol. 2 Tr. 8-9. Mulligan admitted that at no time on the video did he ever observe any physical contact between Steele and Worthington and he did not see Worthington threaten her with any weapon. Vol. 2 Tr. 11. Mulligan admitted that at several points in time Steele told them that she did not want to leave the room. Vol. 2 Tr. 12. Steele repeatedly told them she was fine, that Worthington was not threatening her with a weapon, and that she did not want the officers to harm Worthington. Vol. 2 Tr. 12-21. Steele also told them that she was not being held against her will and Mulligan admitted that he had second thoughts about whether she was actually a victim of kidnapping. Vol. 2 Tr. 16-17. At one point, Steele told them that she could come out if she wanted, but was choosing not to do so. Vol. 2 Tr. 17. Mulligan admitted that at no time during the confrontation did Steele indicate that she was being restrained or was in the room other than voluntarily. Vol. 2 Tr. 19. Mulligan also admitted that at the time of the incident, he did not tell the other officers that Worthington lunged at him, but instead indicated that he was cut while removing the knife from Worthington's hand while Worthington was being "tased". Vol. 2 Tr. 45.

{¶9} On redirect, Worthington testified that soon after he arrived on the scene, they asked Steele to exit the room and she replied with "I can't".  Vol. 2 Tr. 53.  Mulligan testified that Worthington did not voluntarily hand over the knife and that it had to be forcefully taken from him.  Vol. 2 Tr. 57.

{¶10} Lieutenant Robert Lutes ("Lutes") of the Kenton City Police Department was the final witness for the State.  Vol. 2 Tr. 60.  Lutes testified that he was sent to the home because "a man was acting out."  *Id.*  Upon his arrival, Helen met him and told him that Worthington was "going crazy."  Vol. 2 Tr. 61.  They then entered the home and Helen screamed that he had a knife.  Vol. 2 Tr. 62.  Lutes looked up and saw Worthington at the top of the stairs with "his hand to his throat", so Lutes drew his weapon.  *Id.*  Lutes tried to speak with Worthington, but he kept refusing and told Lutes "I'm not coming down, you better come up here locked and loaded."  Vol. 2 Tr. 65.  Lutes then waited for back-up to arrive and continued talking to Worthington.  Vol. 2 Tr. 66.  Worthington kept refusing to come out and telling Lutes that "you're gonna have to kill me."  Vol. 2 Tr. 68.  At that time Lutes did not know Steele was upstairs until he heard her talking.  *Id.*  Several times Lutes asked Steele to come out, but she responded with "I can't".  Vol. 2 Tr. 69-70.  When the room was breached, his sole responsibility was to remove Steele from the room, so he was not part of the group that dealt with Worthington.  Vol. 2 Tr. 76.  After the door was kicked open, Steele came out when asked and she was very scared.  Vol. 2 Tr. 77.

**{¶11}** On cross-examination, Lutes testified that when he saw Worthington at the top of the stairs, Steele was not with him. Vol. 2 Tr. 80. Lutes admitted that although Steele said she could not come out, she did not say that Worthington was preventing her from leaving. Vol. 2 Tr. 85. Lutes testified that he really had no idea what was occurring in the bedroom. Vol. 2 Tr. 87. Before the officers forced entry into the room, Worthington and Steele asked for a couple of minutes to say goodbye before they would exit the room. Vol. 2 Tr. 90.

*Sufficiency of the Evidence*

**{¶12}** Worthington claims in the third assignment of error that the convictions are not supported by sufficient evidence. A claim of sufficiency of the evidence raises a due process question concerning whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶219, 954 N.E.2d 596 (citing *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541). "On review of the sufficiency of the evidence to support a criminal conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶34, 840 N.E.2d 1032 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560).

{¶13} In this case, Worthington was convicted on two counts. To prove the first count of Kidnapping, the State had to present evidence to show that Worthington 1) by force, threat, or deception 2) restrained another person's liberty 3) for the purpose of using the person as a hostage. R.C. 2905.01(A)(1). A review of the record indicates that on the tape Steele told the officers that she could not leave the room when they asked her to leave the room. The evidence shows that the door was locked and that Worthington had a knife. The evidence also shows that the situation persisted for over an hour. Viewing this evidence in a light most favorable to the State, a reasonable juror could reasonably determine that Steele was restrained from leaving the room by threat of force and that she was a hostage in the situation. Thus, the conviction was supported by sufficient evidence.

{¶14} In Count Four Worthington was charged with Felonious Assault of a Peace Officer, so the State was required to prove that Worthington 1) knowingly 2) caused physical harm to another with a deadly weapon and 3) that the victim was a police officer. The evidence in this case was that Worthington had a knife, that Mulligan was cut with the knife while attempting to remove it from Worthington's hand, and that Mulligan was a peace officer. Mulligan testified that it appeared to him that Worthington was attempting to cut him with the knife when he was injured. Viewing this evidence in a light most favorable to the State, a reasonable juror could include that Worthington knowingly cut Mulligan with the knife causing physical harm to Mulligan and that Mulligan was a peace officer.

Thus, the conviction is supported by sufficient evidence. Having determined that there is sufficient evidence to support both convictions, the third assignment of error is overruled.

*Manifest Weight of the Evidence*

{¶15} Worthington alleges in his second assignment of error that his convictions are against the manifest weight of the evidence. Unlike sufficiency of the evidence, the question of manifest weight of the evidence does not view the evidence in a light most favorable to the prosecution.

> **Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."**

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 514 (1997) (citing Black's Law Dictionary (6 Ed.1990) 1594). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. Id. Although the appellate court acts as a thirteenth juror, it still must give due deference to the findings made by the jury.

> **The fact-finder, being the jury, occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the**

-10-

> **like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.**

*State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist. 1998).

{¶16} At first glance, the evidence in this case may not appear to be overwhelmingly in support of conviction on the charges. There is no evidence that Steele was forced to go into the room and the testimony appears to indicate that she was willingly in the room prior to Worthington's entry into the room. Despite Steele's statements on the tape that she could not leave the room, she does not claim that the inability to leave is a result of any threat to her safety made by Worthington or that Worthington is restraining her. Other than the circumstances, there is no indication that Steele was being used as a hostage. To the contrary, Steele on numerous occasions indicates that she does not want to leave, that she is safe, but that she is concerned for Worthington's safety. She even indicates at one time that she is free to leave, but is staying. When the officers entered the room, Steele was on the opposite side of the room from Worthington and was able to easily walk out the door. However, there was evidence that Worthington did have a knife and that the door was locked. The officers testified that she was in the room for over an hour and sounded scared. The incident lasted for approximately ninety minutes and on multiple occasions Steele indicated she could not leave the room. The jurors heard the tape where Steele made the comments and were able

to evaluate for themselves what occurred during the time. The jury determined that Steele was being restrained and used as a hostage. We must give due deference to their determination. This court does not find that the evidence weighs heavily against conviction. Thus, the conviction for Kidnapping is not against the manifest weight of the evidence.

{¶17} As to the conviction for Felonious Assault of a Peace Officer, the evidence at first glance does not appear to be overwhelming. At the time of the injury, Worthington was being "tased" and Mulligan himself testified that it was occurring because he was shocked as well. Mulligan also testified that the effect of the taser would be to cause muscles to contract and prevent Worthington from being able to move. Although Mulligan claimed at trial that Worthington lunged at him, the tape does not appear to indicate such an activity. However, on the tape, Mulligan is also heard to say that Worthington came at him. Worthington had made numerous threats of harm to law enforcement and had failed to comply with commands to show his hands and release the knife. He struggled to hang on to the knife while Mulligan tried to take it away from him and as a result, Mulligan was cut by the knife. Based upon the evidence before it, a reasonable juror could determine that Worthington had acted in a manner that he should have known would result in injury to a police officer. Thus, the conviction is not against the manifest weight of the evidence. Having determined that the convictions are not

against the manifest weight of the evidence, the second assignment of error is overruled.

*Ineffective Assistance of Counsel*

{¶18} Finally Worthington claims in the first assignment of error that he was denied the effective assistance of counsel because counsel failed to request a new trial.

> **In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." State v. Hester (1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus. When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." State v. Lytle (1976), 48 Ohio St.2d 391, 396–397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.**

> **On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent. See Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 31 O.O.2d 567, 209 N.E.2d 164; * *915 State v. Jackson, 64 Ohio St.2d at 110–111, 18 O.O.3d at 351, 413 N.E.2d at 822.**

*State v. Calhoun*, 86 Ohio St.3d 279, 289, 1999–Ohio–102, 714 N .E.2d 905.

{¶19} Worthington argues that trial counsel should have requested a new trial due to Steele's failure to appear at trial to testify after being subpoenaed by

the State. Criminal Rule 33 does permit a new trial to be granted if there is misconduct of a witness for the State. Crim.R. 33(A)(2). However, there is no law that identifies failure to appear to testify as "misconduct" of a witness. This court has previously held that failure to file motions is not per se ineffective assistance of counsel. *State v. Schlosser*, 3d Dist. Union No. 14-10-30, 2011-Ohio-4183, ¶ 34. To comprise ineffective assistance of counsel, a defendant must show that the motions had a reasonable probability of success. *Id*. Worthington has not provided any law to indicate that his motion had a reasonable probability of success. Thus, the ineffective assistance of counsel claim must fail. *Id*. at ¶ 34, 36. The first assignment of error is overruled.

{¶20} Having found no errors in the particulars assigned and argued, the judgment of the Court of Common Pleas of Hardin County is affirmed.

*Judgment Affirmed*

**ROGERS, P.J. and SHAW, J., concur.**

**/hlo**