[Cite as *State v. Campbell*, 2017-Ohio-9251.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

CASE NO. 1-17-23

    v.

ANTHONY L. CAMPBELL,

O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR 2016 0210

Judgment Affirmed

Date of Decision:  December 26, 2017

APPEARANCES:

    *Michael J. Short* **for Appellant**

    *Jana E. Emerick* **for Appellee**

**WILLAMOWKSI, J.**

{**¶1**} Defendant-appellant Anthony L. Campbell ("Campbell") appeals the judgment of the Allen County Court of Common Pleas. He claims his conviction (1) was not supported by sufficient evidence and (2) was against the manifest weight of the evidence. For the reasons set forth below, the judgment of the lower court is affirmed.

*Facts and Procedural History*

{**¶2**} On May 31, 2016, Jeff "Boo" Simpson ("Simpson") and Campbell went to Cynthia Kindred's ("Kindred") house. Tr. 89. Campbell knew Kindred and had previously dated her. Tr. 87. Simpson asked Campbell to knock on Kindred's door to see if she was at home. Tr. 89. Consequently, Campbell got out of Simpson's car, walked onto Kindred's porch, and knocked on her front door. Tr. 89. When Kindred came to the front door, Campbell said, "Boo wants to talk to you." Tr. 89. At this point, Simpson came to the front porch and began talking to Kindred. Tr. 89. At trial, Campbell stated that he did not overhear everything that Simpson said to Kindred but did hear Simpson mention someone's name and something about a hospital. Tr. 90. During a recorded interview with a Detective Steven Stechschulte ("Stechschulte") prior to trial, Campbell made several additional statements describing the conversation between Simpson and Kindred.

**Stechschulte: What was their conversation about on the porch?**

**Campbell: He was talkin' to her somethin'—sayin' somethin' about somebody who was in the hospital or some s\*\*\* like that.**

**Stechschulte: Did he say who?**

**Campbell: He didn't say. I couldn't understand him.**

**Stechschulte: So he made her believe that he was going to take her to the hospital because somebody had gotten hurt—**

**Campbell: Yeah.**

**Stechschulte: —and they needed to get there?**

**Stechschulte: Did he say how they got hurt or why they were in the hospital?**

**Campbell: He said they had a heart attack or somethin' or somethin' or another.**

**Stechschulte: So he tricked her?**

**Campbell: Yeah.**

Ex. 7. After the conversation on Kindred's front porch, Kindred returned into her house. Tr. 90. Simpson turned to Campbell and told him that Kindred was going to come with them in the car. Tr. 90. Kindred then came back outside and got into the car with Campbell and Simpson. Tr. 90.

{¶3} Simpson drove the car while Campbell was sitting in the passenger seat and Kindred was sitting in the back seat. Tr. 91. Simpson then drove the car to several other houses. Tr. 91. At each of these houses, Simpson would stop the car, get out of the vehicle, and go inside the house for several minutes. Tr. 91. Kindred and Campbell remained in the car during each of these stops. Tr. 91. After several

stops, Campbell told Simpson, "Look, * * * I've got something to do. * * * Drop me off at Main and Vine." Tr. 90. Simpson dropped Campbell off at Vine Street in between 12:00 and 12:30 a.m. on June 1, 2016. Tr. 91. From that location, Campbell walked to a bar. Tr. 91. After staying at the bar for a short time, Campbell then went to his brother-in-law's house, where he stayed until 4:00 a.m. Tr. 92. From his brother-in-law's house, Campbell went to his own home. Tr. 92.

{¶4} In between 8:00 and 8:30 a.m. on June 1, 2016, Simpson came to Campbell's house and said, "I want you to do me a favor. * * * I want you to go to the bank with me." Tr. 93. Campbell agreed and then asked, "What's up?" Tr. 93. Simpson said, "Well, she [Kindred] owes me some money. I want you to go to the bank with me and go in with her." Tr. 93. Campbell replied, saying, "Okay." Tr. 93. At trial, Campbell was asked about why he did this favor for Simpson. Tr. 97. This exchange reads, in its relevant part, as follows:

> **Q. There's been, at least during your interview, there was some talk that you were going to get some sort of either money, or drugs, or something like that for helping Jeff out with this; is that right?**
>
> **A. Yea. He just said he would take care of me.**
>
> **Q. Okay. To you, that meant that he was going to give you some cash or he was going to give you some drugs?**
>
> **A. Yea.**

Tr. 97. Campbell then got into Simpson's car. Tr. 93. Simpson then drove Kindred and Campbell to a branch of Fifth Third Bank in Lima, Ohio. Tr. 93. During the

-4-

police interview prior to trial, Campbell told a police detective details about a conversation between Simpson and Kindred that occurred while Kindred was in the car with Simpson and Campbell. Ex. 7. This police interview revealed the following details about this conversation:

**Campbell: They had a conversation in the car. They was talkin' in the car. They had a conversation.**

**Stechschulte: What was that conversation about?**

**Campbell: About—it was about money.**

**Stechschulte: She owed him what? Two fifty?**

**Campbell: I have no idea.**

**Stechschulte: Okay. She owed him a large amount of money, and he said she was going to pay it now. Is that right?**

**Campbell: Yeah.**

**Stechschulte: Okay. And she was like: "I don't have it." And he was like: "I'll beat that a** until you get me that money." Is that correct?**

**Campbell: Uh-huh.**

**Stechschulte: So she says what?**

**Campbell: She says she's, uh, she's going to the bank. She asked me to go in the bank with her.**

**Stechschulte: She says, "Take me to the bank. I'll get your money."**

**Campbell: Uh-huh**.

Ex. 7. At trial, however, Campbell denied that Simpson threatened Kindred in any way while she was in the car with Campbell and Simpson. Tr. 94, 97.

{¶5} They arrived at the bank before it opened. Tr. 93. According to Campbell, while they were waiting in the car for the bank to open, Simpson said to Kindred, "You ain't going to have no problem getting me my money; are you?" Tr. 93. She replied, "No." Tr. 93. At roughly 9:00 a.m., Kindred and Campbell went into the bank while Simpson remained in his car. Tr. 44. At trial, Campbell claimed that, as they walked into the bank, he asked Kindred "if she was okay with [this]" because she "seemed nervous." Tr. 95, 102. However, Campbell did not mention having asked Kindred this question during his interview with Stechschulte prior to trial. Ex. 7. Tr. 102.

{¶6} After Campbell and Kindred entered the bank, Kindred approached the counter where Barb Winkle ("Winkle"), a customer service representative employed by the bank, began to assist her. Tr. 34. At trial, Winkle testified that Kindred would come to the bank each month to make a withdrawal from her account. Tr. 31. For this reason, Winkle was familiar with Kindred. Tr. 31-32. Winkle, however, had never seen Campbell come in with Kindred before. Tr. 35. During the entire interaction between Kindred and Winkle at the counter, Campbell lingered two or three feet behind Kindred. Ex. 1-4. Tr. 33-34. As Kindred approached the counter, Winkle began to fill out a withdrawal slip for her. Tr. 35. She then passed the slip to Kindred across the counter. Tr. 35. Kindred then began

filling out the slip. Tr. 36-37. Winkle testified that Kindred "looked scared" and "frightened" as she filled out the slip. Tr. 40, 42. Kindred wrote on the slip that she wanted to withdraw $730.00 from her account and signed her name. Ex. 5. She also wrote a note that said, "He going to kill." Ex. 5.

{¶7} When Kindred passed the slip back across the counter, Winkle noticed the note that Kindred had written. Tr. 39. Upon seeing this note, Winkle looked up at Kindred and, noticing that Campbell was facing the opposite direction, mouthed the words "Do you want me to call the police?" Tr. 40. In response, Kindred "shook her head 'yes.'" Tr. 40. Winkle then made an excuse to leave the counter, saying that she needed to get more money from the back to complete this transaction. Tr. 39. She also asked Kindred to take a seat while she went into the back. Tr. 42. During this time, Simpson was in the car and called Campbell's cell phone to ask why the transaction was taking so long. Tr. 94. Once Winkle was out of Campbell's sight, she informed her manager of this situation. Tr. 40. Winkle's manager then called the police. Tr. 42.

{¶8} Patrolman Matt Boss ("Boss") of the Lima Police Department responded to the call that the bank manager placed with the police and arrived at the bank within roughly five minutes of the call. Tr. 45, 47. The report that Boss received was that there "was a robbery taking place at a bank. It was not a bank robbery. It was a female slid a note to the teller stating that she was in fear for her life." Tr. 47. He then added that the report indicated that "there was a female that

was being forced to do something against her will." Tr. 47. When the police arrived, they made a silent approach to the bank. Tr. 48. As Boss was walking towards the bank, he saw Simpson in a tan car in the bank's parking lot. Tr. 49. He was familiar with Simpson as he had arrested Simpson a number of times. Tr. 49. He did not engage Simpson then because he, at that time, was unaware of any connection between the situation in the bank and Simpson. Tr. 51. Thus, he proceeded into the bank where another patrolman took Campbell into custody. Tr. 51. Boss then spoke with Kindred. Tr. 52. He later testified at trial that the story Kindred told him at the bank was consistent with the report that Boss had heard from dispatch. Tr. 52.

{¶9} After Campbell was apprehended, Stechschulte was assigned to investigate the incident at the bank on June 1, 2016. Tr. 57. Later that day, he received a call at 3:10 p.m. informing him that Kindred had died at her home. Tr. 59. Initially, the police believed that Kindred's death may have been connected to the incident in the bank that had happened earlier that day. Tr. 61, Ex. 7. However, the subsequent investigation into her death and the autopsy report showed that Kindred died of a drug overdose and that her death was not a homicide. Tr. 61-62. As part of his investigation into the bank robbery, Stechschulte interviewed Campbell on June 2, 2016. Tr. 67. This interview was recorded and played for the jury during the trial. Ex. 7. Tr. 69. During this interview, Campbell began by insisting that he did not know Simpson and that Kindred was the one who had asked him to go into the bank with her. Ex. 7. Later in the interview, however, he admitted

that he knew Simpson and that Simpson was the person who asked him to go into the bank with Kindred. Ex. 7.

{¶10} On July 14, 2016, Campbell was charged with robbery in violation of R.C. 2911.02(A)(2), (B)(2) and kidnapping in violation of R.C. 2905.01(A)(2), (C)(1). Doc. 3. At his trial on May 9 and May 10, 2017, Campbell chose to testify. Tr. 87. He admitted during cross examination that he had told Stechschulte two lies during the police interview. Tr. 101. He testified that the first lie he told was that he and Kindred got high the night before they went to the bank. Tr. 101. He then testified that the second lie that he told Stechschulte was that Simpson threatened Kindred while they were in the car. Tr. 101. The jurors found Campbell guilty of both counts. Doc. 99, 100. At sentencing, the trial court determined that the two offenses merged. Doc. 101. After the prosecution elected to proceed on the kidnapping charge, Campbell was sentenced on May 10, 2017. Doc. 101.

{¶11} Campbell filed notice of appeal on June 7, 2017. Doc. 109. On appeal, he raises the following two assignments of error:

**First Assignment of Error**

**The convictions are not supported by the weight of the evidence.**

**Second Assignment of Error**

**The convictions are based on insufficient evidence.**

For the purposes of analytical clarity, we will examine Campbell's second assignment of error prior to consideration of his first assignment of error.

*Second Assignment of Error*

{¶12} In his second assignment of error, the Defense argues that the State did not present evidence to support the assertion that Simpson or Campbell used deception or force to remove Kindred from her residence. Further, the Defense also argues that the State did not establish with evidence the assertion that Campbell's presence in the bank in any way restrained her liberty. For this reason, the appellant argues that he was convicted in the absence of sufficient evidence and requests that this Court reverse his conviction.

Legal Standard

{¶13} "A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial." *In re Swift*, 8th Dist. Cuyahoga No. 79610, 2002 WL 451226, 3 (March 21, 2002), citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Pierce*, 3d Dist. Seneca No. 13-16-36, 2017-Ohio-4223, ¶ 6, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state*

*constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997), fn. 4. "The sufficiency of the evidence analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Brentlinger*, 2017-Ohio-2588, --- N.E.3d ---, ¶ 21 (3d Dist.), quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12; *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

{¶14} Sufficiency of the evidence is a question of law and a "test of adequacy rather than credibility or weight of the evidence." *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *Thompkins, supra*, at 386. The standard for sufficiency of the evidence

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 62 (3d Dist.), citing *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 47.

{¶15} In this case, the jury found Campbell guilty of kidnapping by complicity in violation of R.C. 2905.01(A)(2). Doc. 101, 109. Specifically, Campbell was convicted of knowingly aiding or abetting Simpson in kidnapping

Case No. 1-17-23

Kindred for the purpose of facilitating a robbery. Tr. 139. Ohio's complicity statute

reads, in its relevant part, as follows:

> **(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:**
>
> **\* \* \***
>
> **(2) Aid or abet another in committing the offense;**

R.C. 2923.03(A).

> **To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.**

*State v. Schaeffer*, 2015-Ohio-3531, 41 N.E.3d 813, ¶ 18 (3d Dist.), quoting *State v.*

*Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), at syllabus.

> **In particular, the defendant's criminal intent may be inferred from his or her presence, companionship, and conduct before and after the offense is committed. The elements of aiding and abetting another in the commission of a crime may be demonstrated by both direct and circumstantial evidence.**

(Citations omitted). *State v. Haller*, 2012-Ohio-5233, 982 N.E.2d 111, ¶ 12 (3d

Dist.). To establish the elements of a kidnapping in violation of R.C. 2905.01(A)(2),

the State had to demonstrate that Campbell, by complicity, used (1) "force, threat,

or deception" (2) to "remove another from the place where the other person is found

-12-

or restrain[ed] the liberty of the other person" (3) with the purpose of "facilitat[ing] the commission of any felony or flight thereafter." R.C. 2905.01(A)(2).

Legal Analysis

{¶16} In this case, the State produced several pieces of evidence to substantiate the first element of kidnapping. First, the State introduced a recorded interview in which Campbell made several revealing admissions to Stechschulte. Ex. 7. Campbell said that Simpson drove him to Kindred's house and asked Campbell to knock on her door. Campbell confirmed that, once he drew Kindred out of her house, Simpson engaged her in a conversation in which Simpson told her that someone she knew was in the hospital. Campbell then added that Simpson told her that this person "had a heart attack or something.'" Ex. 7. Further, Campbell confirmed that Simpson "made [Kindred] believe that he was going to take her to the hospital * * *." Ex. 7. Once Kindred was in the car, Campbell confirmed that Simpson and Kindred began fighting about a sum of money and that Simpson told Kindred, "I'll beat that a** until you get me that money." Ex. 7. Second, the State also introduced the bank slip on which Kindred had written, "He going to kill." Ex. 5. Third, Winkle—who had authenticated this exhibit—testified that Kindred appeared to be "frightened" and "scared." Tr. 40, 42. Winkle also stated that Kindred responded in the affirmative when asked whether she wanted the police to be called. Tr. 40. Fourth, the State also introduced four photographs that showed

-13-

Campbell remained in close proximity to Kindred during the entire interaction between Kindred and Winkle at the bank counter. Ex. 1-4.

{¶17} For the second element, the prosecution introduced the recording of Campbell's interview with the police. Ex. 7. Campbell stated that he and Simpson picked up Kindred from her home after Simpson told her that someone she knew was in the hospital. Ex. 7. Under the impression that they were going to the hospital, Kindred got into the car with Campbell and Simpson. Ex. 7. Simpson then drove her and Campbell to several houses. Ex. 7. During the morning after Simpson and Campbell picked her up, Simpson drove Campbell and Kindred to the bank. Ex. 7. Simpson asked Campbell to accompany Kindred into the bank. Ex. 7. Campbell subsequently accompanied Kindred into the bank. Ex. 7. Further, Boss testified that he saw Simpson in a tan car outside of the bank, confirming that Simpson drove Campbell and Kindred to the bank. Tr. 49.

{¶18} For the third element, the prosecution introduced the recording of the police interview in which Campbell confirmed that Kindred and Simpson were fighting over a sum of money that Kindred owed Simpson. Ex. 7. Campbell also confirmed that the purpose of their trip to the bank was for Kindred to get the money that she owed Simpson. Ex. 7. The prosecution also introduced the bank slip that showed Kindred was at the bank to withdraw $730.00 from the bank. Ex. 5. The prosecution also called Boss as a witness. Tr. 45. Boss testified that he heard a report from dispatch that there "was a robbery that was taking place in a bank. It

-14-

was not a bank robbery. It was a female had slid a note to the teller stating that she was in fear for her life." Tr. 47. He then stated that he "was under the impression that there was a female that was being forced to do something against her will." Tr. 47. Boss also testified that the account that Kindred provided to him after the incident was consistent with the report that he received while he was on patrol. Tr. 52.

{¶19} Contrary to the Defense's argument, the State did present evidence that Simpson and Campbell used deception to remove Kindred from her house. The evidence supporting this element came from Campbell's own mouth during the police interview. Ex. 7. A reasonable inference can be drawn from these statements that Kindred was deceived into joining Simpson and Campbell in Simpson's car on the night of May 31, 2016. Similarly, the State produced evidence that Kindred was in the bank against her will. Kindred wrote "He going to kill" on the withdrawal slip as Campbell lingered several feet behind her in the bank. Ex. 1-5. Again, a reasonable inference can be made from this evidence that Campbell was cooperating with Simpson to hold Kindred in the bank against her will.

{¶20} In viewing all of the evidence in the record in the light most favorable to the State, we find that the prosecution produced evidence to support each of the essential elements of kidnapping in violation of R.C. 2905.01(A)(2). Further, the evidence in the record, if believed by the jury, provided an adequate basis for concluding that Campbell was guilty as charged. For these reasons, we find that

Campbell's conviction for kidnapping was supported by sufficient evidence. Thus, Campbell's second assignment of error is overruled.

*First Assignment of Error*

{¶21} In his first assignment of error, the Defense argues that the evidence presented at trial weighs manifestly against a finding of guilty. In particular, the Defense focuses on whether the evidence suggests—in any way—that Kindred was motivated to get into the car by the deception of Campbell or Simpson. Similarly, the Defense claims that Campbell did not make any threats aimed at Kindred. Finally, the Defense argues that no evidence was presented that Campbell used force to restrain Kindred while they were in the bank. For these reasons, appellant requests that this Court reverse his conviction.

Legal Standard

{¶22} When "deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion." *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist.1997). "Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict." *Plott, supra*, at ¶ 73. In the manifest weight analysis, "the appellate court sits as a 'thirteenth juror' * * *." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *Thompkins* at 389. On appeal, courts

**must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."**

(Citations omitted). *Plott, supra*, at ¶ 73. "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *Haller*, *supra*, at ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Legal Analysis

{¶23} For the manifest weight analysis, we reincorporate the evidence presented under the second assignment of error in the sufficiency of the evidence analysis. In this analysis, we will add to this evidence the information from Campbell's testimony and factors that implicate the credibility of the testimony offered at trial. At trial, Campbell testified in his own defense. Tr. 87. During his testimony at trial, he admitted that Simpson told Kindred that someone she knew was in the hospital while they were on her front porch and that Simpson stated in the car that Kindred owed him money. Tr. 90, 93. He further testified that Simpson asked him to perform a favor, which was to accompany Kindred into her bank and

-17-

that Simpson made assurances that he (Simpson) "would take care of [him]" (Campbell) for performing this favor. Tr. 97. During his testimony, Campbell confirmed that he interpreted Simpson's promise to "take care of [him]" to mean that Simpson would give him money or drugs. Tr. 97. At trial, Campbell also claimed that he asked Kindred whether she was "okay with this" on the way into the bank and indicated that Kindred stated that she was okay with this arrangement. Tr. 95. However, he did not mention this during his interview with Stechschulte prior to trial. Tr. 102.

{¶24} Further, the recording of the police interview with Campbell showed Campbell changing his story multiple times. Ex. 7. Campbell began this interview by insisting that he did not know Simpson, but he later admitted to having known him and having had performed work on his house. Ex. 7. Tr. 105. He also claimed during the police interview that Kindred was the person who asked him to go to the bank with her, but, later in the interview and at trial, stated that Simpson was the person who asked him to go into the bank with Kindred. Ex. 7. Tr. 103.

{¶25} At trial, Campbell also alleged that he only told the police two lies in his interview. Tr. 101. According to Campbell, the first lie was the claim that he got together with Kindred at a bar where they got high. Tr. 101. The second lie that he allegedly told the police was the claim that Simpson threatened Kindred while they were in the car together. Tr. 101. At trial, Campbell said that he told these two lies during the police interview "'cause I didn't want to be involved in anything."

Tr. 108. Additionally, Campbell also admitted at trial that he had a felony conviction for possession of drugs and several convictions for operating a vehicle while impaired. Tr. 88. He also stated that he could not remember whether he had a felony theft conviction from 1990 but that he would not dispute having the conviction if it were on his criminal record. Tr. 88-89.

{¶26} The Defense argues that the State did not establish that Kindred was, in fact, deceived by the representations of Simpson that someone she knew was in the hospital. However, the State presented the recording of the police interview in which Campbell confirmed that Simpson "tricked [Kindred]." Ex. 7. Further, the Defense argues that the State did not prove that Campbell made the threats or used force to kidnap Kindred. However, Campbell was convicted of kidnapping by complicity for aiding and abetting in the kidnapping of Kindred. Thus, the State did not have to prove that Campbell himself made the threats or deceptive statements that facilitated the kidnapping in order for him to be found guilty of kidnapping by complicity. *State v. Jones*, 3d Dist. Marion No. 9-02-39, 2003-Ohio-1576, ¶ 37, citing *State v. Mendoza*, 137 Ohio App.3d 336, 342, 738 N.E.2d 822 (3d Dist.2000) (holding "[e]xpressed concurrence or conduct contributing to an unlawful act, may constitute aiding or abetting the act."). Rather, the State had to produce evidence that showed, from the surrounding circumstances, that Campbell "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime and that the defendant shared the criminal intent of the

principal." *State v. Rowe*, 3d Dist. Seneca No. 13-10-14, 2011-Ohio-5739, ¶ 32, quoting *Johnson*, *supra*, at syllabus.  Finally, the Defense argues that Campbell did not use force to hold Kindred against her will in the bank.  However, the State did not need to prove that Campbell held her in the bank by physical force because R.C. 2905.01(A)(2) prohibits kidnapping "by force, threat, *or* deception."  (Emphasis added).  R.C. 2905.01(A)(2).

{¶27} After considering the evidence on the basis of its weight and credibility, we find that a jury could have determined from the evidence presented at trial that Campbell was guilty of kidnapping by complicity.  In this case, the jury could have found Campbell's statements from the police interview to have been more credible than his testimony at trial.  A conviction is not against the manifest weight of the evidence merely because the testimony presented at trial conflicts and the trier of fact resolves these conflicts in favor of the State.  *State v. Shafer*, 3d Dist. Hardin No. 6-05-15, 2006-Ohio-4189, at ¶ 28, citing *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277, 279 (1986).  Based on the evidence in the record, we find that the jury could have reasonably concluded from the evidence presented at trial that Campbell was complicit in the kidnapping of Kindred.  Further, we do not see any indication that the jury lost its way and returned a verdict against the manifest weight of the evidence.  For these reasons, Campbell's first assignment of error is overruled.

*Conclusion*

**{¶28}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Allen County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**PRESTON, P.J. and SHAW, J., concur.**

**/hls**